Terrell Morgan MOORE, by His Next
Friend, Elizabeth Mears Moore,
Appellant,

v.

ORDER MINOR CONVENTUALS, A Cor-
poration (heretofore designated as Fran-
ciscan Order of Monks), and Father
Jerome Dukette, Appellees.

No. 7777.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 8, 1959.

Decided May 22, 1959.

———◆———

T. A. Uzzell, Jr., and Kester Walton,
Asheville, N. C. (Harkins, Van Winkle,
Walton & Buck, and Uzzell & Dumont,
Asheville, N. C., on brief), for appellant.

Joel B. Adams, Asheville, N. C.,
(Adams & Adams and Anthony Red-
mond, Asheville, N. C., on brief), for ap-
pellees.

Before SOBELOFF, Chief Judge,
HAYNSWORTH, Circuit Judge, and
BOREMAN, District Judge.

SOBELOFF, Chief Judge.

The fifteen year old plaintiff brought
this suit under the diversity jurisdiction
of the District Court to recover damages
for severe injuries which he sustained
in an explosion in the chemistry labora-
tory of the high school he attended. At
the conclusion of the testimony, the Dis-
trict Judge withdrew the case from the
jury and directed a verdict for the de-
fendants, the school and its principal. It
was the District Judge's view, first, that
there was no legally sufficient evidence
of the defendants' negligence; and sec-
ond, that even if the defendants could be
said to be negligent, the plaintiff was
clearly guilty of contributory negligence,
defeating recovery. The plaintiff ap-
peals, insisting that the case should have
been submitted to the jury.

There was testimony to show that in
September, 1955, the minor plaintiff, Ter-
rell Morgan Moore, was enrolled as a
tenth grade student in St. Francis High
School, a private institution operated at
Asheville, North Carolina, by a Fran-
ciscan Order incorporated under the
name of "Order Minor Conventuals." He
became a member of the first year chem-
istry class. On October 6, 1955, a few
weeks after the beginning of the school
term, the plaintiff and a number of his
classmates were given permission to go
to the chemical laboratory to set up the
equipment for an experiment to be made
later in the day. Friar Faneuf, who
had direction of the laboratory and con-
ducted the chemistry class, gave the boys
the key to the laboratory, but neither
he nor any other person in authority ac-
companied them. The chemicals in the
laboratory were kept in a cabinet which
was not locked. Since the beginning of
the school year there had been about
ten chemistry classes and only two lab-

oratory sessions. The plaintiff testified that he had no other experience in chemical laboratories, and no instruction had been given him with respect to safety in the laboratory, and no warnings as to the dangers involved in mixing chemicals. According to him, there were no written rules or warnings posted with respect to use of the laboratory; nor did any of the literature made available to the chemistry class contain such cautions.

On some points the testimony was in conflict, but the rule requires us to accept the plaintiff's version in testing the correctness of the court's action in granting the instructed verdict in the defendants' favor.

From some source, not the school, Moore knew the formula for making ordinary gunpowder. When the boys assembled in the laboratory, Moore obtained some saltpeter and sulphur, but could find no charcoal for use as the carbon ingredient. Instead of carbon he used manganese dioxide and compounded a mixture of saltpeter, sulphur and manganese dioxide. He poured a small quantity of this mixture upon a table and ignited it with a match. The mixture was combustible, but Moore was disappointed that it only "fizzled" upon ignition and did not produce a more violent explosion. He then obtained some red phosphorous, which, despite the warnings and protests of the other boys, he added to the previous mixture in an effort to produce a more volatile explosive. This is made clear by the plaintiff himself. On cross-examination he testified:

"Q. And you got the phosphorus to put in the previous mixture because the first batch or the first segment of this thing wasn't quite powerful enough to explode? Isn't that right? A. That's right sir.

"Q. So what you were trying to do was to create an explosion? A. Yes, sir."

Later, in reply to a direct question by the court, Moore adhered to this statement. His efforts were successful beyond his expectation, for the unstable mixture exploded in the beeker as he stirred it, resulting in grave and tragic injuries to him, including the loss of one eye and a hand.

Whether there was such a want of care on the part of the school officials as would warrant recovery by a plaintiff who might be reasonably said to be free of negligence, we need not consider, for we think the District Judge was correct in concluding that Moore's injuries were the result of his own acts which were so imprudent as to require, under the laws of North Carolina, the direction of a verdict for the defendant.

Explosives are dangerous, and the Supreme Court of North Carolina has held that even a boy having the mental and physical development of an eight-ten year old is bound to recognize that they are. Stephens v. Blackwood Lumber Co., 191 N.C. 23, 131 S.E. 314, 43 A.L.R. 426. Clearly, if Moore had ignited his mixture with a match, the laws of North Carolina would not permit a recovery for his injuries.

Moore contends, however, that a different situation prevails when the ignition of the explosive occurs at a time and in a manner which were not anticipated by him. The usual rules for the appraisal of conduct recognize no such distinction for, generally, the actor is held to be wanting in due care if he should have recognized that his course of conduct exposed himself, or others, to risk of harm, even though it be perfectly clear that he did not anticipate the particular way in which the injury occurred. Substantially the identical situation, in principle, has been considered by the Supreme Court of North Carolina in Luttrell v. Carolina Mineral Co., 220 N.C. 782, 18 S.E.2d 412, and its decision is binding upon us. In Luttrell it appeared that a twelve year old boy got possession of some dynamite caps and a length of fuse. He knew that if one end of the fuse was inserted into the end of the cap and the other end was lighted with a match, the cap would explode when the burning powder train in the fuse reached the cap. He did not know

that the cap could be exploded by a pin prick and he did not intend to explode the cap when he sought, with a pin, to extract the powder from the cap. The cap, nevertheless, exploded when he did so and the Supreme Court of North Carolina held that there could be no recovery for his injuries, notwithstanding the negligence of the defendant in leaving caps and fuse where playing children might pick them up. The Luttrell boy was exhibiting only that normal inquisitiveness which tempts young boys to investigate what things are made of, but the general knowledge that dynamite caps are dangerous, which the laws of North Carolina imputed to him, was an absolute bar to his recovery, even though he was unaware ignition of the powder and the cap could be caused by his immediate act.

That Moore could not have been unaware that he was dealing dangerously with a dangerous substance is not dependent alone upon knowledge which the laws of North Carolina imputed to a boy of his age and mental development. It is perfectly clear that Moore's companions were voicing their objections and warnings. There was testimony that almost everyone of the other boys voiced such warnings, one of them testifying that he told Moore if he wasn't careful he would "kill us all." Moore persisted in the face of these warnings, as a venturesome boy sometimes persists even in the face of obvious danger. Judges may understand his conduct and sympathize with him in the loss of his eye and his hand, but they cannot permit him, in order to place responsibility for his loss upon others, to be heard to say that he was acting with that degree of care and prudence expected of the average boy his age. Even boys of extraordinary intelligence sometimes act imprudently. Sir Winston Churchill is said to have blown himself high into the air with a self-made bomb when he was a student in Harrow.[1] Fortunately for the history of our age his wounds were only minor,

and it is the good fortune of most of us that we are not made to suffer forever from the consequences of our youthful imprudence. Moore was not so fortunate, but it cannot be said on this record that his imprudence was not a cause of his injuries.

We think the District Judge was correct under the governing decisions of the Supreme Court of North Carolina when he directed a verdict for the defendant.

Affirmed.

---

1. Taylor, Robert Lewis, Winston Churchill—An Informal Study of Greatness, pages 66–67.